IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELISA DIAZ | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11-671 |
| CITY OF PHILADELPHIA | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                            **MAY   10  , 2012**

Presently before the Court is Defendant City of Philadelphia's Motion for Summary

Judgment.  (ECF No. 11.)  For the following reasons, the Motion will be granted.

**I.      BACKGROUND**

**A.      Procedural History**

Plaintiff Elisa Diaz filed a complaint with the Equal Employment Opportunity

Commission ("EEOC"), which issued a Notice of Right to Sue letter on November 1, 2010.

(Compl. ¶ 41 & Ex. A, ECF No. 1.)  This Notice of Right to Sue provided that Plaintiff was

entitled to sue under "Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.

12111, *et seq*., and Title V, Section 503 of the Act, 42 U.S.C. 12203".[1]  (Compl. Ex. A.)

On January 28, 2011, Plaintiff filed a Complaint in this Court, which contained two

allegations.  (Compl.)  First, Plaintiff claims that she suffered discrimination, in violation of the

ADA, "in regard to . . . terms, conditions and privileges of employment," because of her post-

traumatic stress disorder ("PTSD") (Count I).  (*Id*. at ¶¶ 43-44 (quoting 42 U.S.C. § 12112).)

_____

[1] Plaintiff's EEOC complaint was based entirely on the ADA.  It did not assert claims
under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., or any other
discrimination statute.

Second, Plaintiff claims that she "was retaliated against by her supervisor in the CCTV cell room

unit . . . and by members of [the Philadelphia Police Department] who knew about Plaintiff's

sexual harassment charges" (Count II).  (*Id*. at ¶ 49.)  Count II is entitled "Americans With

Disabilities Act . . . Retaliation"; however, Plaintiff cites Title VII's anti-retaliation provision, 42

U.S.C. § 2000e-3(a)(1), as the statutory basis for Count II.  (*Id*. at ¶ 48.)[2]

Defendant filed an Answer on April 15, 2011.  (Answer, ECF No. 3.)  On March 16,

2012, Defendant filed a Motion for Summary Judgment.  (Def.'s Mot. Summ. J., ECF No. 11.)

Plaintiff filed a Response on April 5, 2012.  (Pl.'s Resp., ECF No. 12.)

B.      **Factual Summary**[3]

1.      *Plaintiff's Career Begins in the 39th Police District*

Plaintiff is a former police officer with the Philadelphia Police Department ("PPD").

PPD is an agency of Defendant City of Philadelphia.  Plaintiff began active duty with PPD on

June 16, 2003, after her graduation from the police academy.  (Compl. ¶ 3; Diaz Dep. 6, 20, Pl.'s

Resp. Ex. B.)  In January 2004 Plaintiff was assigned as a patrol officer in the 39th Police District

in North Philadelphia, under the supervision of Sergeant Henry.  (Compl. ¶ 3; Diaz Dep. 6.)  In

April or May of 2004, Sergeant Randy Davis became Plaintiff's supervisor.  Sgt. Davis

convinced Plaintiff to transfer to his plainclothes burglary unit, which she did.  (Diaz Dep. 20.)

Sgt. Davis "immediately began sexually harassing [Plaintiff]."  (Compl. ¶ 5.)

_____

[2] Plaintiff has stipulated to the dismissal of the retaliation claim in Count II.  (Pl.'s Mem. 1, ECF No. 12.)

[3] We "view the facts in the light most favorable to [Plaintiff], and draw all reasonable inferences therefrom in that party's favor."  *N.J. Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 326 (3d Cir. 2007).

According to Plaintiff, the sexual harassment that she experienced was constant and encompassed both physically inappropriate and psychologically intimidating behavior.  Plaintiff claims that in June 2004, while she was completing paperwork during a patrol, Sgt. Davis ordered her to leave the police cruiser and proceeded to kiss her on the neck.  (*Id*.; Davis EEO Mem. 1, Def.'s Mot. Summ. J. Ex. 6.)[4]  Sgt. Davis also attempted to hug Plaintiff.  (Diaz Dep. 26.)  After this incident, Sgt. Davis became a constant and unwelcome presence in Plaintiff's life, visiting Plaintiff while she was on patrol (Davis EEO Mem. 3-4), conducting "ride alongs" with Plaintiff (*id*. at 5-6), and even visiting Plaintiff at her home, unannounced, for reasons unrelated to police business (*id*. at 5, 8; Diaz Dep. 26).  Sgt. Davis purchased a cell phone for Plaintiff, and proceeded to call her constantly, "to the point where the phone calls became annoying" and Plaintiff bought a different cell phone.  (Davis EEO Mem. 2.)  Plaintiff's inclusion in the burglary detail was unusual, given her short tenure at PPD.  The assistance of Sgt. Davis in getting Plaintiff this assignment reflects a pattern of behavior by Sgt. Davis in attempting to be physically near, and often alone with, Plaintiff.

One of Sgt. Davis' ride alongs "lasted approximately five hours" and included a meal.  (*Id*. at 3.)  Finally, Plaintiff reached a point where she "couldn't take it anymore."  (*Id*. at 5.)  She became ill.  (*Id*. at 6.)  Fellow officers and close family members noted that Sgt. Davis' visits to her home upset Plaintiff.  (*Id*.)  Less than two months after Plaintiff began working at the 39th District, Plaintiff's mother spoke with police officials, concerned that Sgt. Davis' behavior would

---

[4] The account of Plaintiff's abuse by Sgt. Davis is drawn largely from an investigative memorandum prepared by the Equal Employment Opportunity Unit ("EEO") at PPD in July 2005, in response to Plaintiff's complaint about how Sgt. Davis was treating her.  The report, prepared by Police Officer Louis Ruiz, notes that several of Plaintiff's allegations were substantiated by external evidence, while other allegations could not be confirmed.

affect her daughter's "safety and well being."  (*Id*. at 7.)

Sgt. Davis' constant presence was unnerving to Plaintiff.  His comments to her were consistently inappropriate.  Plaintiff claims that Sgt. Davis asked about her dating preferences and criteria, and inquired about past relationships.  (*Id*. at 4.)  Sgt. Davis commented on Plaintiff's physical attractiveness, and suggested that Plaintiff take pictures of herself — or permit Sgt. Davis to do so — and submit them to Playboy Magazine or a modeling agency.  (*Id*.) Sgt. Davis stated that he would show the pictures to his friends during an upcoming trip to Las Vegas.  (*Id*.)  Plaintiff also claims that Sgt. Davis discussed problems in his marriage.  (*Id*.)

Plaintiff claims that Sgt. Davis asked her out on dates.  (Compl. ¶ 5.)  Sgt. Davis attempted to present himself to Plaintiff's parents as a potential suitor.  (Davis EEO Mem. 8.) Plaintiff refused Sgt. Davis' romantic entreaties, noting that she did not date either married men or supervisors.  (*Id*. at 6-7.)

Working in this environment adversely affected Plaintiff.  Plaintiff experienced "physical symptoms including stomach problems, insomnia, anxiety, depression and panic attacks." (Compl. ¶ 7.)  In August of 2004, Plaintiff received treatment from her family physician, Dr. Adam Pasternack, D.O.  (*Id*.)  Dr. Pasternack diagnosed Plaintiff with Irritable Bowel Syndrome ("IBS"), anxiety and depressive disorder, and proceeded to treat Plaintiff for her conditions.  (*Id*. at ¶ 8.)[5]

---

[5] The following is an outline of Plaintiff's medical history.  Plaintiff's stomach problems date from at least August 2003.  Plaintiff's physicians' handwriting is largely illegible, and we cannot ascertain the full extent of her illness and treatment.  (Pasternack Notes D01494, Pl.'s Resp. Ex. SS.)  In July 2004, Dr. Pasternack noted that Plaintiff was suffering from additional stomach issues, and prescribed Diflucan, an antifungal drug generically known as fluconazole. *See, e.g., In re Vicuron Pharms., Inc. Sec. Litig.*, No. 04-2627, 2005 U.S. Dist. LEXIS 15613, at *5 n.3 (E.D. Pa. July 1, 2005) (describing purpose of Diflucan).  On August 24, 2004, Plaintiff

Plaintiff responded to the pattern of harassment by complaining to Inspector Carl Holmes, whom she knew from her time at the police academy.  (Davis Arbitration Op. 3, Def.'s Mot. Summ. J. Ex. 7.)  Plaintiff did not approach Lieutenant Bratina Baldieri, who was stationed in the 39th District, "because she perceived a friendship between the lieutenant and Sergeant Davis." (*Id*. at 4.)  Inspector Holmes advised Plaintiff of her rights under PPD Directive 97, which outlined PPD's equal employment policies.  (*Id*.)  Inspector Holmes asked Plaintiff not to file an EEO complaint immediately, so that Inspector Holmes could see if he and another officer, Inspector Horne of PPD's Internal Affairs Department, could resolve the matter informally with Sgt. Davis.  (*Id*. at 4-5.)  On September 23, 2004, Plaintiff filed an EEO complaint charging Sgt. Davis with sexual harassment.  (*Id*. at 5; Diaz EEO Compl., Pl.'s Resp. Ex. RR.)[6]  Sometime in

---

appears to have been prescribed clonazepam (commonly known as Klonopin), which is often "used to relieve panic attacks."  *Cribbs v. Astrue*, No. 10-1561, 2011 U.S. Dist. LEXIS 140583, at *4 n.6 (W.D. Pa. Dec. 7, 2011).  Plaintiff also appears to have been offered other prescriptions to assist her in sleeping.  (Pasternack Notes D01493.)  In September 2004, Plaintiff was prescribed sertraline (commonly known as Zoloft), which is approved by the Food and Drug Administration ("FDA") for depression, panic attacks, PTSD, social anxiety disorder and other conditions.  *Colacicco v. Apotex, Inc.*, 521 F.3d 253, 270 n.14 (3d Cir. 2008) (vacated on other grounds) (describing purpose of drug).  In March 2005, Plaintiff was prescribed escitalopram (commonly known as Lexapro), which is an anti-depressant.  *Hughes v. Astrue*, No. 10-1300, 2012 U.S. Dist. LEXIS 12891, at *7 (W.D. Pa. Feb. 2, 2012) (describing purpose of drug).  Dr. Pasternack prescribed two additional drugs that cannot be identified.  There is also evidence that Plaintiff has been, at various points, prescribed Prozac, a common anti-depressant, *see Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 393 (7th Cir. 2010) (describing purpose of drug), Seroquel, Cymbalta and other drugs.

[6] Plaintiff alleges that in October 2004, as a result of her filing the sexual harassment complaint, Sgt. Davis made false accusations against her.  He accused her of fraternizing with drug dealers.  Plaintiff was investigated by Internal Affairs and was cleared of all charges. (Compl. ¶ 15.)  According to Plaintiff's Complaint, she was "required to give hair and urine samples and to turn over her service weapon."  (*Id*.; Diaz Dep. 28.)  As a result of these charges, Plaintiff claims that her stress worsened, and she "experienced increased insomnia and IBS symptoms."  (Compl. ¶ 15.)

late 2004 or early 2005, while PPD's investigation of Sgt. Davis' behavior was pending, Plaintiff

was transferred from the 39th Police District to the 35th Police District.  (Pl.'s Mem. 3; Diaz Dep.

28; Compl. ¶ 16.)[7]  Sgt. Davis remained in the 39th District.

Officer Ruiz, who conducted the EEO investigation, concluded that Sgt. Davis had

violated Directive 97 and other non-discrimination policies enacted by PPD and Defendant.

(Davis EEO Mem. 8.)  Ruiz's commanding officer, Lieutenant Frances Neiley, approved his

report.  (*Id*.)[8]

### 2.    *Plaintiff's Career Progresses in the 35th District*

Plaintiff claims that the professional problems which she experienced did not subside

when she arrived at the 35th District.  At the 35th District, Capt. McCloskey was her supervisor.

Plaintiff felt that she was singled out for negative attention and less desirable assignments, such

as guarding prisoners who were receiving medical treatment ("hospital duty"), as a result of her

EEO complaint against Sgt. Davis.  (Compl. ¶ 17.)  According to Plaintiff, Capt. McCloskey put

---

[7] In her Complaint, Plaintiff states that this transfer occurred in 2006.  In her Response to the instant Motion, she claims that this transfer occurred in 2004.  Defendant claims that the transfer occurred in 2006.  (Def.'s Mem. 2.)  The exact date remains uncertain; even her commanding officer, Captain John McCloskey, could not ascertain when she moved to the 35th District.  (McCloskey Dep. 13, Pl.'s Resp. Ex. E.)  Since Capt. McCloskey signed a review of Plaintiff's performance on February 23, 2005 (2005 Performance Review, Pl.'s Resp. Ex. F.), we conclude that the transfer occurred before that date.

[8] The Police Board of Inquiry ("PBI") subsequently held hearings in June 2006, and recommended that Sgt. Davis be suspended for ten days and demoted.  The Police Commissioner adopted the PBI's recommendation.  (Davis Arb. Op. 8.)  An Arbitrator later reversed this decision.

There is reference in the record to a federal lawsuit filed by Plaintiff against Sgt. Davis. (*See* McCloskey April 1 Note, Pl.'s Resp. Ex. EE.)  We have no knowledge of such a lawsuit, and the Electronic Case Filing system ("ECF") in this District has no record of such an action.

her on hospital duty because he could not trust her.  (*Id.*)[9]  Capt. McCloskey claims that he did

not discuss the Sgt. Davis incident extensively with Plaintiff since he "really didn't want to know

her past."  (McCloskey Dep. 14.)

Plaintiff's medical conditions continued during her time in the 35th District.  In May 2005,

Dr. Pasternack prescribed diazepam (commonly known as Valium) and buspirone (commonly

known as Buspar), both of which are typically prescribed for anxiety.  (Pasternack Notes

D01491; *see* National Institutes of Health, MedlinePlus, http://www.nlm.nih.gov/medlineplus/.)

In June 2005, Dr. Pasternack refilled a prescription for Donnatal, a medicine used to treat IBS.

(Pasternack Notes D01491.)  At several appointments throughout 2005, Plaintiff complained to

Dr. Pasternack about various stomach problems.  (*Id.*)  In February 2006, Plaintiff noted that she

was having difficulty sleeping and was prescribed zolpidem (commonly known as Ambien), an

anti-insomnia drug.  (*Id.* at D01488; MedlinePlus.)  Plaintiff was prescribed other medications as

well.  Nevertheless, Plaintiff's job performance at the 35th District was consistently excellent.

Notwithstanding Plaintiff's concerns about Capt. McCloskey, Capt. McCloskey described

Plaintiff as "above average" and "a good street officer" with "a good attitude."  (McCloskey Dep.

74-75.)  Plaintiff's first performance review in the 35th District corroborates McCloskey's

impression, rating her performance positively across the board, narrating that Plaintiff had

"performed [her] duties in an outstanding manner," and telling her to "keep up the good work."

(2005 Performance Review.)  According to a February 2006 evaluation, Plaintiff "has an in depth

knowledge of patrol and aggressively engages in carrying out her duties in a responsible

---

[9] Given the timing inconsistencies, discussed *supra* at note 7, Plaintiff's claim that she
was placed on hospital duty for "three months," and remained on that duty through 2007, is open
to question.  (Compl. ¶¶ 17-18.)

manner." (2006 Performance Review, Pl.'s Resp. Ex. F.)  An April 2007 review reached a similar conclusion, noting her "high level of initiative" and diligence.  (2007 Performance Review, Pl.'s Resp. Ex. F.)[10]

In 2006, Plaintiff applied for a position with PPD's new Strategic Intelligence Tactical Enforcement unit ("SITE"), which was a thirty-six-officer team that Plaintiff describes as an "elite unit." (Diaz Dep. 33-37; McCloskey Dep. 14-15.)  The qualifications were largely based on past performance, and Plaintiff was one of only four female officers accepted into this new unit.  (Diaz Dep. 35.)  Plaintiff participated fully in the activities of SITE.  (*Id*. at 37.)

Plaintiff's year-plus tenure with SITE was the high point of Plaintiff's professional policing career.  Plaintiff indicated that during this time, she "felt better."  (*Id*. at 38.)  She noted that her fellow officers were "wonderful," and that her supervisors "didn't show [her] any type of retaliation based on what had happened with Sergeant Davis and . . . with the 35th District." (*Id*.)  According to Plaintiff, her IBS symptoms also subsided because she "wasn't in the immediate situation . . . [she] wasn't near him."  (*Id*.)[11]  Dr. Pasternack did not record a visit from Plaintiff between November 2006 and February 2008.

In February 2007, Plaintiff was injured during a vehicle and foot pursuit while jumping over a wall.  (*Id*. at 37-38.)  Plaintiff suffered severe knee damage that necessitated removal of her patella band.  (*Id*. at 38.)  After the surgery, Defendant placed Plaintiff on "injury on duty" status ("IOD").  She was out of work for approximately eighteen months from February 2007 to

---

[10] The 2007 Performance Review did mention that Plaintiff needed to be more vigilant about timely and consistent appearances in court.

[11] It is clear that "him" refers to Sgt. Davis.

July 2008.  (*Id.*)[12]  While Plaintiff was on paid HLA[13] leave, the SITE unit was disbanded.  (Diaz

Dep. 45.)  Plaintiff's 2008 performance review cites her IOD status and does not include a

substantive evaluation.  (2008 Performance Review, Pl.'s Resp. Ex. F.)

On December 31, 2007, Sgt. Davis' suspension and demotion were overturned by the

Arbitrator.  (Davis Arb. Op. 40.)  Plaintiff claims that she "found this development to be

upsetting and started to experience increased symptoms of depression and anxiety because" she

feared further harassment.  (Pl.'s Mem. 3.)  In February 2008, Plaintiff visited Dr. Pasternack.  In

March 2008, he prescribed eszopiclone (commonly known as Lunesta), a sleep aid.  (Pasternack

Notes D01486.)

      3.    *Plaintiff's Return to the 35th District*

Plaintiff returned to the 35th District in the summer of 2008.  (Diaz Dep. 45; Compl.

¶ 21.)  Initially, Plaintiff was placed on patrol duty.  (Diaz Dep. 45.)  In September 2008, Plaintiff

approached her street supervisor, Sergeant Christopher Bradshaw, and told him about her anxiety

and range of medications.  (*Id.* at 46.)  Plaintiff requested a "reasonable accommodation" because

---

[12] While Plaintiff was recuperating from surgery, Lieutenant Dan Beck began an internal investigation as to whether or not Plaintiff was faking her injury.  (Diaz Dep. 39.)  Sergeants began visiting her home, conducting what appeared to be "sick checks," which are not ordinarily performed for officers on IOD.  (*Id.* at 39-41.)  Plaintiff admits that she did not comply with all the filing requirements for maintaining her IOD status, though she claims that she believed her doctor was faxing the correct medical documentation to PPD officials.  (*Id.* at 42.)

[13] Plaintiff was on paid leave under the Pennsylvania Heart and Lung Act, 53 Pa. Stat. Ann. § 637 ("HLA").  "The HLA provides lost wages and medical benefits to certain public employees, such as police officers and firefighters, who face significant risks in the ordinary course of their professions . . . HLA benefits are thus similar to workers' compensation wage and medical benefits under the Workers' Compensation Act (WCA), except that the HLA guarantees qualifying employees their full income, instead of a fraction of their income, until they return to duty."  *City of Wilkes-Barre v. Sheils (In re Cole)*, 580 F.3d 179, 182 (3d Cir. 2009) (not precedential).

of her illness.  (*Id.*)  Defendant granted Plaintiff's request and Plaintiff was brought inside to

work in the Closed Circuit Television ("CCTV") unit, a position which entailed monitoring

prisoners.  (*Id.* at 45, 47.)  Plaintiff's supervisor in the CCTV unit was Corporal Tracey Davis.

(*Id.*)

Cpl. Davis was working as the operations room supervisor  at the 35th District in 2007.

(Tracey Davis Dep. 5-6, Pl.'s Resp. Ex. H.)  Prior to her promotion to corporal and transfer to the

35th District, Cpl. Davis had been an officer at the 39th District for eleven-and-a-half years.  (*Id.* at

6-8.)  Despite being assigned to the 39th District, Cpl. Davis had actually been detailed to the 35th

District since 2000 to run the "prison wagon."  (*Id.* at 8.)  During her time at the 39th District,

including her detail to the 35th, her supervisor had been Sgt. Randy Davis.  (*Id.* at 9-10.)

Cpl. Davis had been detailed to the 35th District because of an EEO complaint that she

had filed against a supervising sergeant in the early 2000s, alleging sexual harassment.  (*Id.* at 11-

12, 41.)  While she did know Sgt. Davis, her interactions with him appear to have been limited,

given that she was detailed to the 35th District for most of her tenure in the 39th.  (*Id.* at 16.)[14]

Cpl. Davis claims that she and Plaintiff never discussed the sexual harassment that Plaintiff had

experienced.  (Tracey Davis Dep. 42-43.)

Plaintiff describes Cpl. Davis' treatment of her as "very retaliatory."  (Diaz Dep. 45.)

Cpl. Davis "singl[ed] [her] out a lot," made "constant complaints to our supervisors," and

generally fostered a hostile work environment.  (*Id.*)  Plaintiff did not file any formal complaints

---

[14] Plaintiff describes Cpl. Davis as "a friend of [Sgt.] Randy Davis."  (Pl.'s Mem. 4; Compl. ¶ 24.)  There is no independent verification of this; however, Cpl. Davis has indicated that she also was acquainted with Sgt. Davis' wife, Jackie, another police officer.  (Tracey Davis Dep. 39-40.)

with regard to Cpl. Davis' treatment.  (*Id*.)  She did, however, informally complain to Sgt.

Bradshaw and to Lieutenant Robert Weitman, explaining that Cpl. Davis "was involved in

[Plaintiff's] sexual harassment complaint and [had] testified against Plaintiff."  (*Id*. at 46.)

Plaintiff advised that it would be best not to be placed under her supervision.  This suggestion

was ignored.  (*Id*.)

  While at the CCTV unit, there was an incident between Plaintiff and Officer Tamika

Fidler.  Officer Fidler and Plaintiff were apparently disagreeing over a data input issue.

According to Cpl. Davis, both Officer Fidler and Plaintiff became irate, and Plaintiff began to

use offensive language.  (Tracey Davis Dep. 33-35.)  Officer Fidler then physically struck

Plaintiff.  (*Id*. at 35.)   Plaintiff claims that Cpl. Davis testified falsely against her at the

disciplinary hearing.  (Compl. ¶ 28.)  Plaintiff was disciplined more seriously than Officer Fidler.

Plaintiff received a seven-day suspension.  (Tracey Davis Dep. 38-39; Pl.'s Mem. 4.)

  Notwithstanding Plaintiff's concerns about Cpl. Davis, Cpl. Davis' evaluation of

Plaintiff, which was written on March 7, 2009, was generally positive.  (2009 Performance

Review, Pl.'s Resp. Ex. F.)  Plaintiff's performance was rated as satisfactory in all categories

except one; Cpl. Davis considered Plaintiff's performance unsatisfactory as it concerned

"dependability."  (*Id*.)  Cpl. Davis claimed that Plaintiff "frequently calls out sick and takes

numerous vacation days off," so "improvement is needed in her attendance and dependability."

(*Id*.)

  In March 2009, Plaintiff's service in the CCTV unit ended.  (Diaz Dep. 47-48.)

Plaintiff's supervisors decided to move her to a patrol unit.  (*Id*. at 48.)  On March 12, 2009,

Plaintiff discussed this with her supervisors, advising that her medications could cause delayed

reactions that would make her a sub-optimal patrol officer, and that she feared she might put other officers in jeopardy.  (*Id*.; *see also* Bradshaw Mem. ¶ 2, Pl.'s Resp. Ex. O.)  At the time, Plaintiff was taking one milligram of the anti-anxiety drug alprazolam (commonly known as Xanax) twice a day, as well as antidepressant and sleep medication.  (Diaz Dep. 48-49; MedlinePlus.)[15]  Plaintiff claims that she wanted to continue working inside until she "got better."  (Diaz Dep. 48.)

Plaintiff's supervisors decided to have Plaintiff medically evaluated in order to "determine her fitness for duty as a Police Officer."  (Diaz Dep. 49; Bradshaw Mem. ¶ 4.)[16] Plaintiff was referred to Dr. George Hayes, M.D., medical director of the City of Philadelphia's Employee Medical Services, also known as the Medical Evaluation Unit ("MEU").[17]  (Hayes Dep. 5-6, Pl.'s Resp. Ex. C.)  Dr. Hayes, along with Dr. Joan Beckwith, M.D., a physician under his supervision, evaluated Plaintiff on March 25, 2009.  (Diaz MEU Records 5, Pl.'s Resp. Ex. T; Def.'s Mem. 3.)  Dr. Hayes noted that Plaintiff was requesting a restricted duty designation. (Diaz MEU Records 5.)  On March 26, 2009, Dr. Hayes decided to refer Plaintiff to Dr. Anthony Arce, M.D., a psychiatrist, for further evaluation related to her PTSD.  (*Id*. at 8.)  This referral

---

[15] Plaintiff visited Dr. Pasternack in August 2008, and again in October of that year. (Pasternack Notes D01486-85.)  Dr. Pasternack's notes of these visits are illegible.  In December 2008, Plaintiff visited Dr. Pasternack, who noted her stress and stomach issues, and that Plaintiff was having panic attacks.  (*Id*. at D01484.)  The Xanax appears to have been prescribed in November of 2005 or 2006.  (*Id*.)

[16] PPD's procedures governing such situations are complex and confusing, involving a number of official directives, local and state policies, and intermediary steps.  (*See* Madden Dep. 15-20, Pl.'s Resp. Ex. D.)

[17] This facility, which evaluates City employees, is also referred to colloquially as "19th and Fairmount."  (*See, e.g.*, Madden Dep. 31.)

was required by PPD Directive 109, which requires the medical director to refer an officer

seeking a duty evaluation for mental fitness reasons to an evaluating psychiatrist.  (Directive 109

§ 2 ¶ C, Pl.'s Resp. Ex. M.)  On the same date, Dr. Beckwith determined that "no duty" was the

correct work status for Plaintiff.  (Duty Status Determination, Pl.'s Resp. Ex. DD.)[18]

       The medical professionals treating Plaintiff seem unsure as to what extent she was able to

work.  In a March 12, 2009 letter, Dr. Pasternack stated that Plaintiff was "severely depressed,"

and that her medications "put her at risk in the line of duty due to side affects (sic) that they may

cause."  Dr. Pasternack added that he believed "that Officer Diaz is unable to function safely as a

Philadelphia police officer."  (Pasternack Letter, Pl.'s Resp. Ex. S.)  However, in notes dated

March 24 and 25, 2009, Dr. Pasternack also requested that Plaintiff be permitted to "be on light

duty" due to IBS, and he noted that he was treating her for "IBS only."  (Diaz MEU Records 5,

7.)  Dr. Alissa Brown, Psy.D., a licensed psychologist, had evaluated Plaintiff on March 4, 2009,

after a referral from Dr. Pasternack.  (Diaz Dep. 61-62.)  Dr. Brown stated that Plaintiff suffered

from PTSD "which appears to be directly related to events experienced on the job as a police

officer with [PPD]."  (Brown Evaluation 158, Pl.'s Resp. Ex. R.)

---

       [18] The following are the different duty statuses under which an injured or ill police officer or employee can be classified.  An officer can be placed on "no duty," which means that she should not be working as a police officer.  If the injury is service-connected, that officer will receive paid leave; if not, the employee "will be required to use sick, holiday, vacation, and compensatory time."  (Directive 109 § 8 ¶ A.1.)  "Active duty" refers to officers who have returned from "no duty" status.  (*Id*. at ¶ 3.)  "Limited duty" requires designation by police headquarters, and is a sedentary position, or "desk work," which often involves detail out of an officer's district.  (*Id*. at ¶ 2; Hayes Dep. 42; Madden Dep. 41.)  The decision to place an officer on "limited duty" is made by a primary care physician at MEU.  (Madden Dep. 41.)  "Restricted duty" is similar to "limited duty," except that "limited duty" is only available for cases in which the injury was service-connected.  (Hayes Dep. 42; Spagnola Expert Report 6, Pl.'s Resp. Ex. PP.)

There is no record of Plaintiff's visit with Dr. Arce, and there is a dispute over what occurred during the visit.  (Hayes Dep. 13-14.)  According to Dr. Hayes, Dr. Arce would have filled out a consultation report after meeting with any patient.  (*Id*.)  Plaintiff claims that she did go to an appointment with Dr. Arce (Diaz MEU Records 11; Diaz Dep. 50), but that no evaluation took place (Pl.'s Mem. 8).  According to Plaintiff, Dr. Arce was "rambling," called Plaintiff "ungrateful," and stormed out.  (Diaz Dep. 50.)  On the other hand, Dr. Hayes claims that, according to Dr. Arce, Plaintiff was "unwilling to participate in the interview," refusing to answer Dr. Arce's questions and exhibiting "belligerent, hostile, angry and insulting" behavior.  (Hayes Letter, Pl.'s Resp. Ex. Q.)  Dr. Hayes indicates that he wrote to Madden, advising that because of Dr. Arce's failed attempt to evaluate Plaintiff, "we are unable to properly assess her for her ability to return to full active duty."  (*Id*.)[19]  Dr. Arce never sent a report to the medical director, as required by PPD regulations.  (Directive 109 § 2 ¶ D.)

Plaintiff sought to have PPD declare that her disability was a result of the sexual harassment she had experienced, and consequently, to grant her IOD status.  This would have entitled her to HLA benefits.  (Diaz Dep. 51.)  Plaintiff contacted Carol Madden, Defendant's occupational safety administrator.  (*Id*.; *see also* Madden Dep. 17.)  Pursuant to regulations, Plaintiff and Capt. McCloskey completed a City of Philadelphia Accident, Injury & Illness Report.  (COPA II Report, Pl.'s Resp. Ex. FF.)  Plaintiff claimed that her injuries were the result of Sgt. Davis' sexual harassment of her and the retaliation she had suffered in the nearly five

---

[19] Dr. Arce was a third-party contractor and not a City employee.  (Madden Dep. 57-58.) He is currently suffering from Alzheimer's disease.  Accordingly, he no longer practices medicine and was not deposed in this matter.  (*See* Shields Correspondence, Pl.'s Resp. Ex. QQ.)

years since filing her EEO complaint.  (*Id*.)[20]  Capt. McCloskey noted on the COPA II Report that

"none of these injuries are job-related."  (*Id*.)  On May 14, 2009, this report was forwarded to

CompServices, an outside third-party contractor retained by the City to manage its duty-related

injury claims.  (Workers' Comp. Denial, Pl.'s Resp. Ex. W.)

      Plaintiff's claim was evaluated by Nadine Rice, an adjuster with CompServices.  Rice

determined that Plaintiff was not eligible for IOD status and denied her request after consultation

with Madden.  (Rice Dep. 19, 34, Pl.'s Resp. Ex. G; *see also* Rice Notes, Pl.'s Resp. Ex. X.)

Plaintiff's request for IOD status was denied on May 19, 2009.  (Workers' Comp. Denial 2.)

Rice denied Plaintiff's request without having seen MEU's medical files or evaluations.  (Rice

Dep. 45.)

      Plaintiff's final day of work was March 12, 2009; however, she used vacation and sick

leave time to extend her paid tenure at PPD through June 2009.[21]  (Diaz Dep. 54.)  Plaintiff

requested medical leave pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29

U.S.C. § 28, *et seq*.  (Diaz FMLA Request, Pl.'s Resp. Ex. HH; Diaz Dep. 53-54; Diaz FMLA

Medical Form, Pl.'s Resp. Ex. AA.)  Defendant granted this request, and Plaintiff was placed on

FMLA leave from April 1, 2009 to June 11, 2009.  After her FMLA leave expired, Plaintiff

---

    [20]  Sgt. Davis became Plaintiff's supervisor in June 2004.  Plaintiff alleges that this is
when the harassment began.  (Compl. ¶¶ 4-5.)  Plaintiff filed the sexual harassment complaint in
September 2004, and Plaintiff was transferred out of the 39th Police District in late 2004 or early
2005.  The time that Plaintiff was directly exposed to any harassment by Sgt. Davis was therefore
limited.

    [21]  The exact dates are not clear.  The record indicates that Plaintiff's leave of absence
began on May 21, 2009.  (McCloskey Termination Mem. ¶ 1, Pl.'s Resp. Ex. II.)  A note from
Sgt. Bradshaw indicates that she had exhausted all of her accrued leave balances and was on
unpaid leave effective May 23, 2009.  (Bradshaw Leave Mem., Pl.'s Resp. Ex. JJ.)

requested a medical leave of absence.  (Diaz Leave Request, Pl.'s Resp. Ex. GG.)  Plaintiff was

on an unpaid medical leave of absence for six months, from June 2009 to December 2009.  (Diaz

Dep. 55.)

> 4.     *Plaintiff's Medical Leave and Subsequent Termination*

Plaintiff began treatment with Dr. Ira N. Herman, M.D., a psychiatrist, on June 10, 2009.

(Herman Letter.)[22]  Dr. Herman changed Plaintiff's medications, and Plaintiff's condition

improved as a result.  (*Id*.)  According to Dr. Herman, Plaintiff "would have been able to return

to full duty by early 2011," and "perform her duties as a police officer without restrictions."  (*Id*.)

Plaintiff was required to seek an extension of her unpaid medical leave in December

2009.  She failed to do so.  Plaintiff claims  that she was unaware of this requirement and

assumed that she had not been cleared to return to duty.  (Diaz Dep. 54.)[23]  On January 21, 2010,

Capt. McCloskey requested that Plaintiff be terminated from employment with PPD, citing her

failure to return from her leave of absence.  (McCloskey Termination Mem. ¶ 1.)  Capt.

McCloskey noted that Plaintiff had been scheduled to return to work on December 11, 2009, and

had not done so.  (*Id*.)  On February 16, 2010, Plaintiff was notified that she had been "separated

from the Police Department under the designation of 'Terminated – Did Not Return from Leave

_____

[22] In her Memorandum, Plaintiff states that treatment with Dr. Herman began in February 2009, and that Dr. Herman changed her medications, which led her to become drowsy.  (Pl.'s Mem. 4.)  Dr. Herman indicates that he had concluded in May 2009 that Plaintiff could not perform street patrol.  (Herman Letter, Pl.'s Resp. Ex. OO.)

[23] PPD Directive 66 sets out the requirements for a PPD employee seeking to return from sick leave or a leave of absence lasting longer than ten days.  (Directive 66, Pl.'s Resp. Ex. KK.)  It is incumbent upon the employee to comply with the requirements of this Directive.  (*Id*. at § 1 ¶ 3.)  Those requirements are set out in Section XV (entitled "Return to Duty") of the Directive.  The employee is required to report to the MEU at 1901 Fairmount Avenue on or before the date she is scheduled to return to duty.  (*Id*. at § 15 ¶ B.1.)

of Absence.'"  (Termination Letter, Def.'s Mot. Summ. J. Ex. 16.)

## II.   LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will

not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving

party may identify an absence of a genuine issue of material fact by showing the court that there

is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d

Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth

specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A

party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to

particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts").  "Where the record taken as

a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a

motion for summary judgment, courts must view facts and inferences in the light most favorable

to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or

make credibility determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125,

1127 (3d Cir. 1995).

## III.   DISCUSSION

Defendant seeks summary judgment on several grounds.  Defendant argues that "Plaintiff's ADA discrimination claim fails because, by her own admission, she cannot perform the essential functions of a police officer."  (Def.'s Mem. 6.)  Second, Defendant claims that Plaintiff "has failed to demonstrate that she was denied a reasonable accommodation by defendant or that a reasonable accommodation could be made in her particular case."  (*Id.*)  Third, Defendant states that Plaintiff "cannot show that the adverse employment action she wants to challenge is a result of disability discrimination" by Defendant.  (*Id.*)

"The ADA prohibits covered employers from discriminating against disabled individuals" on the basis of their disability.  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010); *see also* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability.").[24]  "To establish a prima facie case of discrimination" in violation of the ADA, "a plaintiff must show (1) that [s]he is disabled within the meaning of the

---

[24] Defendant argues that the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), does not control because those amendments took effect on January 1, 2009 and are not considered retroactive.  (Def.'s Mem. 6.)  Defendant is correct that the amendments do not apply retroactively.  *Weidow v. Scranton Sch. Dist.*, No. 11-1389, 2012 U.S. App. LEXIS 2422, at *12 n.7 (3d Cir. Feb. 7, 2012) (not precedential) ("Every Court of Appeals to consider the issue has held that the ADAAA does not have retroactive effect.") (citations omitted).  We disagree, however, with Defendant's statement that "most of plaintiff's contentions involve events which occurred before January 1, 2009."  (Def.'s Mem. 6.)  The core of Plaintiff's ADA claim involves events that occurred after January 1, 2009, such as the March 2009 attempt to move Plaintiff to patrol duty, the May 2009 denial of paid leave to Plaintiff, and Plaintiff's termination as a PPD officer in early 2010.  The events that preceded January 1, 2009 provide the background for Plaintiff's claim; however, it is clear that Plaintiff's ADA claim involves events which post-date the ADAAA, and therefore are covered by the ADAAA-amended version of the ADA.

ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable

accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result

of discrimination."  *Sulima*, 602 F.3d at 185 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d

296, 306 (3d Cir. 1999)).

### 1.      *Plaintiff's Disabled Status*

To succeed on her claim that she was discriminated against in violation of the ADA,

Plaintiff must first establish that she was disabled as that term is defined in the ADA.  The ADA

provides that an individual has a disability if she has (I) "a physical or mental impairment that

substantially limits one or more major life activities of such individual," (ii) "a record of such an

impairment," or (iii) is "regarded as having such an impairment."  42 U.S.C. § 12102(1).

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual

tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

learning, reading, concentrating, thinking, communicating, and working."  *Id*. at § 12102(2)(A).

Furthermore, "an impairment that is episodic or in remission is a disability if it would

substantially limit a major life activity when active."  *Id*. at § 12102(4)(D).  We construe this

definition liberally, with an eye towards "broad coverage of individuals under" the ADA.  *Id*. at §

12102(4)(A).  We do not categorically classify specific ailments under the ADA, but instead

examine the specifics of a plaintiff's facts.  "[D]eterminations under the ADA are quite

fact-specific," and "the inquiry as to disability is to be made on a case-by-case basis."  *Tice v.*

*Ctr. Area Transp. Auth.*, 247 F.3d 506, 509, 513 (3d Cir. 2001).

We are satisfied that Plaintiff can show that she is disabled, as that term is defined in the

ADA.  Defendant does not disagree.  In fact, Defendant contends that Plaintiff's mental health

problems constitute a disability that completely disqualifies Plaintiff from being a police officer. (Def.'s Mem. 7.)  It is clear that Plaintiff's PTSD, depression, anxiety, insomnia, panic attacks and IBS constitute "physical or mental impairments" that substantially limit one or more of Plaintiff's major life activities.  Plaintiff points to difficulty sleeping, concentrating and working. She notes that her reaction time is affected by her disability.  She has a diminished ability to think and concentrate.  (Brown Evaluation 159.)  Furthermore, the medical professionals indicate that Plaintiff should be on "limited duty" or "no duty" at all because of her disability.  In addition, Plaintiff suffers from panic attacks.  (Diaz Dep. 16.)  Her ability to conduct normal work activities has been adversely affected.  (*Id*. at 18-20.)  Clearly, the performance of major life activities has been substantially limited by Plaintiff's physical and mental conditions. Plaintiff had a disability at the time that the events in question took place.

### 2.    *Plaintiff's Qualifications*

Defendant argues that Plaintiff is not a "qualified individual" under the ADA and cannot perform the essential functions of a police officer.  (Def.'s Mem. 7.)  Plaintiff bears the burden of proving that she is a "qualified individual" for the purposes of the job in question.  *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996).  The Third Circuit has established a two-prong test for determining whether someone is a qualified individual under the ADA.  First, we must determine whether the individual satisfies the prerequisites for the position, by possessing the appropriate educational background, employment experience, skills and licenses.  Second, we must determine whether the individual can perform the essential functions of the position, with or without reasonable accommodation.  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Plaintiff clearly possesses the necessary education, intelligence and employment experience to be a Philadelphia police officer.  This is evidenced by her successful service as a Philadelphia police officer after her graduation from the police academy, her conduct while a member of the elite SITE team, and the evaluations that she has received from her supervisors. Plaintiff has the qualifications to be a police officer.

Since Plaintiff satisfies the prerequisites for the position, we look to whether Plaintiff can perform the essential functions of the job.  Plaintiff is a patrol officer.  That is what she was trained as at the police academy, and that is essentially what she has been since her graduation. However, at this point in her career, Plaintiff cannot function as a patrol officer.  Because of the physical and mental problems that Plaintiff is experiencing, she cannot do that job.  Plaintiff and Defendant both agree that this is the case.  The parties disagree on the consequence of not being able to perform the functions of a patrol officer with PPD.

Plaintiff argues that she is a qualified individual with a disability and that under the ADA, Defendant had an obligation to enter into an interactive process with her and to provide a reasonable accommodation for her disability.  Plaintiff argues that permitting her to return to the CCTV unit would have been a reasonable accommodation that would have given her time to resolve her physical and mental problems so that she could return to duty as a patrol officer. Plaintiff argues that Defendant's refusal to provide her with that reasonable accommodation and forcing her to take unpaid leave were adverse employment actions and constituted disability discrimination.[25]

---

[25]  Plaintiff also argues that there are other positions at PPD that could reasonably accommodate her.  Plaintiff cites two district court cases, *Acevedo v. City of Phila.*, 680 F. Supp. 2d 716 (E.D. Pa. 2010), and *Reilly v. Upper Darby Twp.*,809 F. Supp. 2d 368 (E.D. Pa. 2011),

Defendant argues that Plaintiff cannot perform the functions of a police officer because of her mental health problems and that she is therefore not qualified for the position. Defendant argues that Plaintiff's PTSD, depression and panic attacks, and the medications that she takes for these conditions, makes it impossible for her to do the work of a police officer. Defendant also argues that providing an accommodation to Plaintiff would provide a hardship for PPD and that in any event, the Department did accommodate Plaintiff by permitting her to take unpaid leave with the understanding that when her problems had been resolved, she could return to duty as a police officer in the City of Philadelphia. Defendant argues that Plaintiff was ultimately terminated because she never returned.

    *3.*    *Plaintiff's Reasonable Accommodation*

The ADA includes, in its definition of discrimination, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). It is well-settled that "refusing to make reasonable accommodations for a plaintiff's disabilities" constitutes discrimination under the ADA. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). Under the ADA, if the employer refuses to make an accommodation, the employer must "demonstrate that

---

for the proposition that when a patrol officer is unable to perform his or her regular duties, there are multiple positions in the police department that the patrol officer might be able to fill which do not have the same requirements and which could provide a reasonable accommodation for the patrol officer. Plaintiff argues that whether the other position is a reasonable accommodation is a fact question for the jury.

We would first note that both *Acevedo* and *Reilly* are easily distinguished from the instant case. Both involve physical injuries which interfered with the officers' ability to physically do the job as a patrol officer, but did not interfere with their doing other jobs. In *Reilly,* the problem was a neurological disease which caused a weakness in the legs and in *Acevedo*, it was a hand injury that prevented the officer from holding a gun. Neither case involved a mental health problem, which is obviously quite different.

the accommodation would impose an undue hardship on the operation of the business of the [employer]." *Id*.

"Although the ADA itself does not mention an 'interactive process' with respect to reasonable accommodations," the ADA's regulations require that the "appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009); *see also* 29 C.F.R. Pt. 1630, App. § 1630.9 at 359. Such "interactive process" requires nothing more than that "employers make a good-faith effort to seek accommodations." *Hohider*, 574 F.3d at 187.

According to Defendant, "to assign plaintiff a restricted-duty position would present an undue hardship for [PPD]." (Def.'s Mem. 8.) Defendant argues that not accommodating Plaintiff by assigning her to an "inside" position advances two of PPD's core interests: ensuring that Plaintiff will pursue treatment while not on active duty, and ensuring that the "safe and efficient operations of the department are not compromised." (*Id*.) Defendant argues that Plaintiff was not qualified to perform "any police duties whatsoever," and that placing her on an "inside" job would undermine PPD's mandate to "enforc[e] criminal laws and protect[] the safety and welfare of the people of the City of Philadelphia." (*Id*.)

Defendant has accommodated Plaintiff consistently during her years with PPD. In 2004, after Plaintiff filed her sexual harassment complaint against Sgt. Davis, PPD moved her to the 35th Police District, away from Sgt. Davis. After Plaintiff injured her leg, the Department placed her on paid HLA leave. She was out on HLA leave for eighteen months. Upon returning from her leg injury, Plaintiff was placed in the CCTV unit for a six-month period, *as a response to her*

*request for a reasonable accommodation*.  Plaintiff's time at CCTV was problematic, however, because of attendance issues which cast doubt on her dependability (*see* 2009 Performance Review), and because of the physical confrontation with Officer Fidler, which resulted in Plaintiff receiving a seven-day suspension.  After Plaintiff was denied IOD status in 2009, Defendant granted her request for FMLA leave and for a medical leave of absence.

Plaintiff suggests that an accommodation in the CCTV Unit would be reasonable.  However, there is a reasonable basis to question whether, given her problems in that unit before, such an accommodation was reasonable in March 2009.  Certainly "[n]ot all requested accommodations are appropriate, and the ADA only 'provides a right to reasonable accommodation, not to the employee's preferred accommodation.'"  *Stadtmiller v. UPMC Health Plan, Inc.*, 799 F. Supp. 2d 492, 509 (W.D. Pa. 2011).

"Police officers are likely to encounter extremely stressful and dangerous situations during the course of their work."  *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146-47 (9th Cir. 2010).  The idea that Plaintiff's mental health issues, considerable drowsiness, panic attacks and decline in alertness could be accommodated merely by emphasizing different responsibilities minimizes the fundamental seriousness of a police officer's duty.  Employment by a police department inevitably involves close proximity to criminal suspects, dangerous weapons and substances, and a number of other concerns which are not implicated in the average office position.  Any police job, including an "inside" job, requires substantial maturity and presence of mind.[26]  Monitoring prisoners in the CCTV unit is not only dangerous, it is difficult.  Anyone

---

[26]  It is clear that "police departments place armed officers in positions where they can do tremendous harm if they act irrationally."  *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999).

involved in police work or familiar with the courts knows the problems that can develop in the performance of that job.[27]  Plaintiff's PTSD, depression, proneness to panic attacks and the side effects of her medication led Defendant to question whether her employment as an officer, even in the CCTV unit, was, in the short-term, practical.  "Especially in the context of police officers, employers do not violate the ADA by ensuring that officers are psychologically fit for duty." *Davis-Durnil v. Vill. of Carpentersville*, 128 F. Supp. 2d 575, 580 (N.D. Ill. 2001).  PPD's concern that its officers' mental health issues be resolved before they serve on active duty is unquestionably reasonable.[28]

Defendant was confronted with the question of how best to accommodate Plaintiff's

---

[27] It is interesting to note that prior to this Motion being filed, the case of *Keohane v. Lancaster Cnty.*, No. 07-3175, 2010 U.S. Dist. LEXIS 85714 (E.D. Pa. Aug. 13, 2010), was litigated in this District.  *Keohane* involved a young man with drug and mental health problems who was arrested and placed in the Lancaster County Prison.  He committed suicide.  This resulted in a lawsuit against Lancaster County pursuant to 42 U.S.C. § 1983, alleging the County's violation of the deceased's constitutional rights for allowing the suicide to occur.  Such lawsuits are not uncommon.  *See, e.g.*, *Joines v. Twp. of Ridley*, No. 04-3430, 2006 U.S. Dist. LEXIS 15787 (E.D. Pa. Apr. 4, 2006) (Section 1983 action alleging failure to prevent attempted suicide of arrestee being detained at the police station holding cell);  *Vargo v. Plum Borough*, 376 F. App'x 212 (3d Cir. 2010) (Section 1983 action arising from attempted suicide in police holding cell);  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017 (3d Cir. 1991) (Section 1983 action involving suicide in police department holding cell).  Those who monitor prison inmates must be alert.  An inability to concentrate on a panic attack could result in serious injury or death, and a § 1983 action.

[28] In *Thomas v. Corwin*, the Court of Appeals for the Eighth Circuit recognized that law enforcement agencies could legitimately demand fitness-for-duty evaluations of employees who suffered from anxiety and other mental health issues without implicating the ADA, as "consistent with business necessity."  483 F.3d 516, 527 (8th Cir. 2007).  The plaintiff in *Thomas* worked in a "back-office" role, but the Kansas City Police Department was nevertheless permitted "to take proactive steps to ensure the safety of the public, [plaintiff] and other [] employees."  *Id*.  Indeed, other courts in this Circuit have recognized that "ensuring members' fitness for duty is a business necessity vital to the operation" of police departments.  *Pa. State Troopers Ass'n v. Miller*, 621 F. Supp. 2d 246, 256 (M.D. Pa. 2008).

needs.  Plaintiff's own physician, Dr. Pasternack, had written on March 12, 2009 that Plaintiff

was "severely depressed," that her medications "put her at risk in the line of duty due to side

affects (sic) that they may cause," and "that Officer Diaz is unable to function safely as a

Philadelphia police officer."  (Pasternack Letter, Pl.'s Resp. Ex. S.)  After this diagnosis was

confirmed by Defendant's physicians, who assigned Plaintiff to the status of "no duty."

Defendant determined that Plaintiff should not continue as an active officer.

Plaintiff argues that Defendant failed to follow its own procedures in evaluating her.  Yet

Plaintiff was "uncooperative" while being examined for PTSD and refused to tell the evaluating

physician which medications she was taking.  (Diaz MEU Records 7.)  Plaintiff's visit with Dr.

Arce was unproductive, and was delayed so that Plaintiff could speak with "[the Fraternal Order

of Police] and [her] lawyer."  (*Id*. at 5.)  Defendant's assessment that Plaintiff was not fit to serve

was consistent with her own physician's assessment.  Plaintiff's medical records clearly indicate

that she suffered from serious mental health issues.  Plaintiff cannot point to a genuine issue of

material fact as to her ability to serve during this period of time.

Defendant was placed in a difficult situation.  There existed universal agreement that

Plaintiff was unable to perform the duties of a police officer at that time – both Plaintiff's and

Defendant's physicians had so concluded.  Since placing Plaintiff in an "inside" job was not a

reasonable option, Defendant concluded that the best available option, and the most fair means of

accommodating Plaintiff's disability, was to permit her a temporary, unpaid leave, once all

opportunities for paid leave had been exhausted.  Although this accommodation may not have

been Plaintiff's first choice, it was reasonable under the circumstances.[29]

Defendant did not terminate Plaintiff because of her disability.  Plaintiff's previous position as a full-time police officer was available to her as soon as her condition had improved and she was able to perform all the duties associated with it.[30]  "Employers are not required to accommodate an employee by removing an essential function or restructuring a job so as to avoid [implicating the disability], but, rather, they are to provide an accommodation so as to enable the employee to perform such a function."  *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 285 n.4 (3d Cir. 2001).  Defendant was not required to change the duties of a police officer in order to accommodate Plaintiff.  Plaintiff was struggling with PTSD, depression, panic attacks and the effects of the medication that she was taking.  PPD decided on a single option:  provide Plaintiff with a leave of absence so that she could recuperate.  This accommodation was reasonable.[31]

Plaintiff argues that the issue of what is a reasonable accommodation is for the jury to

---

[29] Plaintiff was not entitled to the specific accommodation that she desired; she merely had a right to have her disability reasonably accommodated by her employer.  *See, e.g., Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir. 1996) ("ADA does not obligate an employer to provide a disabled employee every accommodation on his wish list.").

[30] Plaintiff's physician, Dr. Herman, predicted that she may have been able to return to work without restrictions by early 2011.  (Herman Letter.)

[31] Plaintiff acknowledges that a "reasonable accommodation may be provided by granting an employee an unpaid leave for a length of time sufficient to allow the employee to recover from a temporary disability, even if the unpaid leave was for a 'significant' amount of time."  (Pl.'s Mem. 27-28.)  "The federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future."  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004).  The unpaid leave of absence granted to Plaintiff was six months long, and was intended to permit her to perform her essential job functions in the near future.  That the leave lasted longer is a function of Plaintiff's failure to comply with PPD directives and seek either an extension of that leave or reinstatement as an officer.

decide, not Defendant.  Our courts have determined that usually, what is a reasonable accommodation is a jury question.  However, we are satisfied that when dealing with the unique situation of police officers and issues related to their mental health it would be ill-advised to second-guess the personnel decisions of a police department when it is deciding how it can use a police officer who suffers from mental health problems.  The police department, not a jury, is uniquely qualified to make such sensitive decisions.

The Third Circuit has recognized that in resolving reasonable accommodation claims, "it may be possible to have a case in which summary judgment would be appropriate on that issue." *Colwell v. Rite Aid Corp*., 602 F.3d 495, 506 n.9 (3d Cir. 2010).  We are satisfied that this is such a case.  Defendant's accommodation— medical leave to allow Plaintiff's health to improve—was designed to foster an environment wherein Plaintiff could safely and comfortably perform the functions of her position.  This accommodation was one of several accommodations which Defendant provided to Plaintiff over the course of her career at PPD.  "[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997).  Viewing the full factual history of this action, it is clear that PPD engaged in a good-faith effort to provide an appropriate accommodation to Plaintiff.

Finally, Plaintiff suggests that the denial of HLA benefits was part of Defendant's failure to accommodate her disability, since it deprived her of both pay and medical benefits.  This denial did not constitute a failure to accommodate Plaintiff's disability.  Plaintiff was denied HLA benefits because her injury was determined not to be duty-connected.[32]  Plaintiff appealed the denial of her

---

[32]  As noted above, Plaintiff did not include a Title VII sexual harassment claim in this lawsuit.  Plaintiff appears to be inviting us to permit a jury to decide Plaintiff's sexual harassment claim in this ADA action in the context of her right to HLA benefits based upon IOD

HLA benefits to the City's Civil Service Commission, and her appeal was denied.  Plaintiff could

have challenged the Civil Service Commission's decision in the Court of Common Pleas.  *See,*

*e.g.*, *Phila. Civil Serv. Comm'n v. Ross*, 595 A.2d 200, 201-02 (Pa. Commw. Ct. 1989) (outlining

procedures for review of municipal civil service commission decisions).  Plaintiff apparently chose

not to do so.

       *4.*      *Plaintiff's Termination Claim*

      According to Defendant, Plaintiff never attempted to apply for an extension of the six-

month leave of absence that began in June 2009.  (Def.'s Mem. 9.)  This constituted non-

compliance with PPD Directive 66 and other internal instructions (*see* Unpaid Leave Mem., Pl.'s

Resp. Ex. MM), which required Plaintiff to send medical documentation and submit to a medical

examination no later than the day she was scheduled to return from her leave of absence.  The City

of Philadelphia's Civil Service Regulations provide that failure to return from a leave of absence

constitutes a *de facto* resignation and results in termination of employment.  (Civil Service

Regulation 22.022, Def.'s Mot. Summ. J. Ex. 17.)

      Plaintiff argues that Defendant's reason "is a clear red herring."  (Pl.'s Resp. 39.)  Plaintiff

argues that she was "never evaluated by a psychologist to make an actual fitness for duty

determination," but instead was "simply discontinued before the City even determined the limits –

if any – of her ability to work."  (*Id*.)  Plaintiff further states that she was never provided with the

form to renew her leave of absence, "nor was she ever told she could extend her [leave] for more

than six months."  (*Id*.)  Finally, Plaintiff claims that even had she complied with all procedural

requirements, she "would not have been allowed back due to the inexplicable policy that officers

---

status resulting from Sgt. Davis' sexual harassment.  We are not inclined to accept this invitation.

with stress related injuries are not entitled to limited duty." (*Id*.)

Plaintiff was terminated because she did not follow PPD's directives.  Plaintiff argues that she was never provided with the necessary form or affirmatively told of her ability to extend her leave.  We find this difficult to accept in light of the fact that Plaintiff has acknowledged that on prior occasions, she had proactively contacted Human Resources to learn of her rights and responsibilities related to medical leave.  (Diaz Dep. 54.)  In any event, Plaintiff requested the unpaid leave knowing that resolving her mental health problems was the path back to active duty.  Plaintiff was obligated to follow through on the steps necessary to accomplish this goal.  Plaintiff has offered no legitimate reason why she did not.  Plaintiff was never evaluated by a psychologist for a duty determination because she did not report to MEU at the end of her leave of absence, as required by Directive 66.  Defendant had no option but to terminate Plaintiff.  She never returned to work.  It was her lack of action that caused her termination.

Plaintiff's final claim that Defendant would not have let her return in any event is pure conjecture.  Plaintiff has noted Dr. Herman's assessment that her condition was improving.  Although PPD may ultimately have decided not to return Plaintiff to duty, it was incumbent upon Plaintiff to comply with all procedures established by the City's Directives and Civil Service Regulations.  There is no basis to claim that, had Plaintiff chosen to attempt to return from or extend her leave, she would have been terminated anyway because of her disability.

Plaintiff offers no basis for the conclusion that PPD's termination of her employment was because of her disability.  There exists no genuine issue of material fact on the question of whether Plaintiff was terminated because she failed to follow procedures.  Defendant's reasons for terminating Plaintiff were not pretextual.  Plaintiff was terminated because she never returned to

work.  She was not wrongfully terminated.

## IV.    CONCLUSION

For the foregoing reasons, we grant Defendant's Motion for Summary Judgment.

BY THE COURT:

_____

**R. BARCLAY SURRICK, J.**